J-S18029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                                :              PENNSYLVANIA
                                                  :
             v.                                   :
                                                  :
MANUEL PAGAN, JR.                        :
                                                :
             Appellant                :     No. 1317 MDA 2018

Appeal from the Judgment of Sentence Entered July 11, 2018
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0001286-2017

BEFORE:   BOWES, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:              **FILED JUNE 03, 2019**

Appellant Manuel Pagan, Jr. appeals from the judgment of sentence imposed following his jury trial convictions for two counts each of aggravated indecent assault and indecent assault.[1]  Appellant alleges the trial court erred in making various evidentiary rulings, refusing to find a conflict of interest with trial counsel's representation of Appellant, and imposing separate sentences for the aggravated indecent assault convictions.  We affirm.

We adopt the trial court's facts and procedural history.  ***See*** Trial Ct. Op., 10/3/18, at 1-5.  On July 11, 2018, the trial court sentenced Appellant

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3125(a)(1), (2); 3126(a)(1), (2).

to an aggregate term of seven to twenty years' imprisonment.[2]  Appellant did not file post-sentence motions.

On August 10, 2018, Appellant timely filed a notice of appeal.  The court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, which Appellant timely filed.

Appellant now raises five questions for this Court's review:

[1].  Did the trial court abuse its discretion in determining that the probative value of Appellant's 2005 *crimen falsi* convictions outweighed the prejudicial effect arising from the admission of the evidence?

[2].  Did the trial court err in denying Appellant's objection to an actual conflict of interest created by his filing of a PCRA petition involving representation of Appellant by a member of the Public Defender's Office in another docket?

[3].  Did the trial court err in denying Appellant's motion to admit impeachment evidence?

[4].  Did the trial court err in determining that testimony from two Commonwealth witnesses to whom the victim spoke after the alleged assault constituted prior consistent statements?

[5].  Was Appellant's sentence an illegal sentence with respect to counts 3 and 4 of the information?

Appellant's Brief at 3-4.

---

[2] In relevant part, the trial court sentenced Appellant to five to ten years' imprisonment for aggravated indecent assault "involving forcible digital penetration which occurred downstairs" and a consecutive two to ten years' imprisonment for aggravated indecent assault involving the "digital penetration which occurred upstairs without the victim's consent."  Trial Ct. Op. at 4.

After a review of the parties' briefs, the record, and the trial court's decision, we adopt and affirm on the basis of the trial court's opinion addressing the merits of the issues raised on appeal.[3] **See** Trial Ct. Op. at 5-26. The court did not abuse its discretion in determining that Appellant's 2005 juvenile adjudications were more probative than prejudicial under the circumstances of this case. **See id.** at 5-9. The court correctly determined that trial counsel from the public defender's office did not have a conflict of interest due to Appellant's filing of a Post Conviction Relief Act[4] petition, alleging ineffective assistance from another member of the public defender's office in an unrelated case. **See id.** at 9-13. The court did not err in denying Appellant's motion to admit DNA evidence suggesting that the victim engaged in prior sexual activity with other males, because the limited impeachment value of the evidence was outweighed by its prejudicial effect. **See id.** at 14-18 (discussing 18 Pa.C.S. § 3104).

The court did not abuse its discretion by admitting the victim's statements to her mother and friend, which were admissible as evidence of the "prompt complaint" of the sexual assault. **See id.** at 22-24. Finally, Appellant's aggravated indecent assault convictions did not merge for sentencing, because Appellant committed multiple criminal acts and the

---

[3] We do not, however, adopt the trial court's conclusion that the victim's statements to her mother and friend were admissible as prior consistent statements to rehabilitate, pursuant to Pa.R.E. 613(c). **See** Trial Ct. Op. at 19-22.

[4] 42 Pa.C.S. §§ 9541-9546.

charges were based on two different subsections of the statute. ***See id.*** at 25-26. Accordingly, having discerned no abuse of discretion or error of law, we affirm the judgment of sentence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/03/2019

Circulated 05/07/2019 12:19 PM

October 11, 2018

Re: Manuel Pagan, Jr.
Cp Cr No: 1286-2017
Superior Cr No: 1286 MDA 2018

Index of Opinion

1. Index of Opinion
2. Opinion

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CRIMINAL**

COMMONWEALTH OF PENNSYLVANIA :
:                    1317 MDA 2018
vs.                                                :
:                    CP-36-CR-0001286-2017
MANUEL PAGAN, JR.                           :

**PA R.A.P. 1925 OPINION**

BY TOTARO, J.

Presently before the Superior Court of Pennsylvania is an appeal filed by Manuel Pagan,

Jr. ("Appellant") from the judgment of sentence imposed on July 11, 2018. For the reasons

stated herein, the appeal should be denied.

**BACKGROUND**

On April 11, 2018, Appellant appeared before the court for a jury trial on one count of

rape by forcible compulsion, one count of sexual assault, two counts of aggravated indecent

assault, and two counts of indecent assault.[1] (Notes of Testimony, Trial at 68-70) (hereinafter

"N.T."). At trial, Lauren Aston ("victim") testified that on November 29, 2016, when she was

eighteen-years-old, she and her sister went to Appellant's studio to drink and hang out. *Id.* at

247-49. She had never met Appellant before that evening. *Id.* at 249-50. The victim, her sister,

and Appellant then left the studio and went to Appellant's residence. *Id.* at 251.

When they got to the residence, all three went upstairs to eat and go to sleep. (N.T. at

254). After the victim laid down to go to sleep, Appellant put his hands down her pants and put

his fingers into her vagina. *Id.* at 254-55. The victim, who did not give Appellant consent, left

the bedroom and went downstairs to sleep on the sofa. *Id.* at 255-56. The next thing the victim

---

[1] 18 Pa.C.S.A. § 3121(a)(1), 18 Pa.C.S.A. § 3124.1, 18 Pa.C.S.A. § 3125(a)(2), 18 Pa.C.S.A. §
3125(a)(1), 18 Pa.C.S.A. § 3126(a)(2), and 18 Pa.C.S.A. § 3126(a)(1), respectively.

remembered was waking up with Appellant on top of her, his hands on her chest, and his penis in her vagina. *Id*. at 257-58. The victim told Appellant to stop and tried to push him off of her, but Appellant did not stop until the victim's sister came downstairs and pulled him off. *Id*. at 258.

The victim stated that she and her sister then left Appellant's house and got into their car, at which time Appellant came outside and tried to get them to stay. (N.T. at 258-59). While Appellant was at the car, the victim was crying and talking on the phone with her friend, Tiffany Hatchel ("Hatchel"). *Id*. at 259. When they left Appellant's residence, the victim dropped her sister off at their mother's home and drove to Hatchel's house, where she told Hatchel what had happened. *Id*. The victim then went home and told her mother, who called police. *Id*. at 259-60. This all happened on the same day as the sexual assault. *Id*.

The victim's sister, Kaitlyn Aston ("Kaitlyn"), testified that while they were in bed upstairs, she saw Appellant's hand moving towards the victim. (N.T. at 215). Later, after the victim went downstairs, Kaitlyn went downstairs to find Appellant on top of the victim. *Id*. at 218. The victim was screaming for help and trying to push Appellant off of her. *Id*.

Still images from a safety coalition video showed that on November 29, 2016, at 4:56 a.m., Appellant, the victim, and Kaitlyn arrived at Appellant's home by vehicle. (N.T. at 512-15). At 6:58 a.m., Appellant can be seen standing at the driver's side window of the victim's car. *Id*. at 515-16. Images taken at 7:23 a.m. and 7:32 a.m. show Appellant standing at the front of the victim's car leaning into the driver's window. *Id*. at 516-17. The victim's car then left the scene at around 7:56 a.m. *Id*. at 518-19.

Hatchel testified that on November 29, 2016, between 7:00 a.m. and 8:00 a.m., the victim called her on the telephone. (N.T. at 341-42). The victim was hysterical. *Id*. at 342. Later that

2

morning, between 9:00 a.m. and 9:30 a.m., the victim arrived at Hatchel's house and told Hatchel that she was asleep on a couch, she awoke, and a male was on top of her. *Id.* at 343-44. The victim related that she kept telling him "no" and tried to push him off, but the male then "stuck it in her and that was it." *Id.* at 344. The victim was crying hysterically and freaking out. *Id.* When Hatchel was asked whether the victim told her what the male put in her vagina, Hatchel responded that the victim said his penis. *Id.* at 347. When asked whether the victim told her if the male's fingers went inside her vagina, Hatchel replied, "No, ma'am." *Id.*

Renee Aston ("Aston"), the victim's mother, testified that during the late morning or early afternoon hours of November 29, 2016, the victim came home and began to cry. (N.T. at 348-49). The victim then told her mother that a male held her down and raped her. *Id.* at 349-50. Aston took her daughter to the hospital. *Id.* at 351.

Detective James Mummau of the Lancaster City Bureau of Police testified that he obtained an audio recording of a conversation Appellant had with his mother on April 6, 2018, which was marked as Commonwealth Exhibit #31. (N.T. at 526-28). The recording was played for the jury, and Appellant was heard admitting that he had sex with the victim. *Id.* at 533, 596. A second conversation was recorded on April 10, 2018, marked as Commonwealth Exhibit #32, in which Appellant referred to the victim as a "bitch," stated his DNA was not found in the victim, and police would not be able to prove they had sex. *Id.* at 534-35, 596-97. Appellant also sent Kaitlyn a text message after the incident stating, "[j]ust tell her I'm sorry again and I hope she can forgive me, and I hope she's okay." *Id.* at 223-26; Commonwealth Exhibit #8.

Appellant testified at trial and admitted that he inserted his hand into the victim's vagina while upstairs in bed. (N.T. at 626-27). The victim then left the bedroom because he was going

3

to have sex with her sister. *Id.* at 578-79. Approximately 20-30 minutes later, Appellant went downstairs to use the bathroom, he encountered the victim, she suggested they have sex, he inserted his fingers into the victim's vagina again, and they had sexual intercourse. *Id.* at 580-81, 627. Appellant stated the victim was flirting with him and she never said no. *Id.* at 570, 584.

After a three-day trial, Appellant was found not guilty of rape and sexual assault, but guilty on two counts of aggravated indecent assault and two counts of indecent assault. (N.T. at 722-23). A pre-sentence investigation was ordered. *Id.* at 725. On July 11, 2018, the court imposed a sentence of 5-10 years incarceration on count three for aggravated indecent assault involving forcible digital penetration which occurred downstairs. (Notes of Testimony, Sentencing at 30) ("N.T.S."). The court imposed a consecutive sentence of 2-10 years in prison on count four for aggravated indecent assault involving digital penetration which occurred upstairs without the victim's consent. *Id.* at 30-31. Concurrent sentences were imposed on the two counts of indecent assault, for an aggregate sentence of 7-20 years incarceration. *Id.*

On August 10, 2018, Appellant filed the instant Notice of Appeal to the Superior Court. On August 29, 2018, Appellant filed a Statement of Errors Complained of on Appeal ("Statement"), alleging that: (1) the trial court abused its discretion in determining the probative value of Appellant's 2005 *crimen falsi* convictions outweighed the prejudicial effect; (2) the trial court erred in denying Appellant's objection to an actual conflict of interest created by his filing of a PCRA Petition involving representation of Appellant in another case by another member of the Public Defender's Office; (3) the trial court erred in denying Appellant's motion to admit impeachment evidence on the grounds of the Rape Shield law; (4) the trial court erred in determining that testimony from two Commonwealth witnesses whom the victim spoke to after

4

the assault constituted prior consistent statements; and (5) Appellant's sentence was illegal because counts three and four of the Information should have merged for sentencing purposes. *See* Statement. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## DISCUSSION

**I.    The trial court did not abuse its discretion in determining that the probative value of Appellant's 2005 *crimen falsi* convictions outweighed the prejudicial effect.**

Appellant first asserts the trial court abused its discretion in determining that the probative value of his 2005 *crimen falsi* convictions outweighed the prejudicial effect arising from the admission of the evidence. *See* Statement.

Prior to trial, the Commonwealth filed a notice seeking to introduce Appellant's prior juvenile delinquency adjudications from 2005, for counts of receiving stolen property, burglary, and theft by unlawful taking. *See* Commonwealth's Notice of Intent to Introduce Evidence of *Crimen Falsi* Conviction Where More Than Ten Years Has Elapsed. Appellant filed a motion in response seeking to preclude this testimony. *See* Defendant's Motion *in Limine*.

Relevant sections of Pennsylvania Rule of Evidence 609, Impeachment by Evidence of a Criminal Conviction, read as follows:

> (a) In General. For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.

> (b) Limit on Using the Evidence After 10 Years. This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
>> (1)  its probative value substantially outweighs its prejudicial effect; and
>> (2)  the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

(d) Juvenile Adjudications. In a criminal case only, evidence of the adjudication of delinquency for an offense under the Juvenile Act, 42 Pa.C.S. § § 6301 et seq., may be used to impeach the credibility of a witness if conviction of the offense would be admissible to attack the credibility of an adult.

Pa.R.E. 609.

During a pre-trial hearing, the Commonwealth stipulated that Appellant was released from confinement on these offenses more than ten years before the start of trial. (N.T. at 9).[2] However, the Commonwealth asserted that the *crimen falsi* adjudications would be extremely probative if Appellant elected to testify at trial, because the case would "boil down to his word versus the victim's word. . . ." *Id.* at 9-10. The Commonwealth further argued that because the prior adjudications were not sexually-related offenses, they would not in any way suggest to the jury that Appellant had a propensity to commit crimes of violence or sexual assaults. *Id.* at 10. As such, there would be very little prejudicial effect. *Id.*

Appellant argued in reply that there was no probative value to the adjudications because they occurred more than ten years ago, when he was under the age of 18. (N.T. at 11). Counsel further believed this would severely prejudice Appellant if he would testify, even though counsel agreed credibility would be at issue. *Id.* Moreover, counsel argued that the prejudicial effect of this testimony would outweigh any probative value. *Id.*

---

[2] In their Notice, the Commonwealth also sought to introduce juvenile adjudications from February 11, 2008, for the offenses of unsworn falsification to authorities and false identification to law enforcement authorities. *See* Commonwealth's Notice of Intent to Introduce Evidence of *Crimen Falsi* Conviction Where More Than Ten Years Has Elapsed. The sentences were imposed on March 3, 2008, at which time Appellant was placed in commitment for a period of six months. *Id.* Because Appellant was released from the secure facility within ten years of the date of trial, the court ruled that these adjudications were automatically admissible pursuant to Pa.R.E. 609. (N.T. at 7-8). Appellant has not challenged the admissibility of these juvenile adjudications on appeal.

6

In *Commonwealth v. Randall*, 528 A.2d 1326 (Pa. 1987), the Supreme Court identified five factors the court shall consider in determining whether the value of admitting *crimen falsi* convictions more than ten years old substantially outweighs its prejudicial effect. *Id*. at 1328-29. Those factors are: (1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; (2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; (3) the age and circumstances of the defendant; (4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and (5) the existence of alternative means of attacking the defendant's credibility. *Id*. at 1328 (quoting *Commonwealth v. Roots*, 393 A.2d 364, 367 (Pa. 1978).

In *Commonwealth v. Rivera*, 983 A.2d 1211 (Pa. 2009), the appellant, who was twenty-six years of age at the time of his murder trial, had prior juvenile adjudications for robbery and theft which occurred thirteen years prior to trial, when the appellant was only thirteen years old. *Id*. at 1217-18. The appellant contended the trial court abused its discretion by denying his motion *in limine* which requested the exclusion of evidence of his five juvenile adjudications that occurred more than ten years prior to his trial. *Id*. at 1226. After considering the factors identified in *Randall, supra*, the Supreme Court disagreed, concluding the trial court acted within its discretion in determining that appellant's prior juvenile adjudications were more probative than prejudicial. *Id*. at 1228.

7

As noted in *Rivera*, the previous adjudications of *crimen falsi* offenses were relevant to the jury's determination of the appellant's credibility, which was the crux of the case. 983 A.2d at 1228. The appellant's juvenile adjudications for theft offenses did not suggest a propensity to commit murder. *Id.* at 1229. Additionally, "[w]hile the age of Appellant at the time the offenses were committed may militate against admission of the evidence, the remaining factors, namely the prosecution's need to resort to this evidence and the lack of alternative means of attacking Appellant's credibility, clearly favor admission." *Id.*

In *Commonwealth v. Hoover*, 107 A.3d 723 (Pa. 2014), the defendant filed a motion *in limine* seeking to preclude the Commonwealth from impeaching him with evidence of his fourteen-year old *crimen falsi* conviction, which occurred when he was twenty-two years of age. *Id.* at 725. After balancing the *Randall* factors, the trial court denied the motion. *Id.* at 725-26. On appeal, the Superior Court vacated the judgment of sentence and remanded for a new trial after finding that the commission of a *crimen falsi* crime at the age of twenty-two could not be held against the defendant. *Id.* at 727. The Supreme Court disagreed, holding that the Superior Court "paid insufficient deference to the discretionary decision of the trial court, and is not otherwise supported by Pennsylvania law." *Id.* at 729. The Supreme Court then rejected any attempt to discount a prior conviction for impeachment purposes based on the youth of the defendant by stating, "there is no support in Pennsylvania law for the proposition that the probative value of a young adult offender's conviction 'is small.'" *Id.* at 732.

In the present case, the trial court conducted an analysis pursuant to the factors identified in *Randall* and determined that the prior adjudications would reflect upon the veracity of Appellant to a substantial degree, they were less likely to smear Appellant's character or suggest

8

a propensity to commit the crimes for which he stood charged because the prior adjudications were not related to the charges presently before the court, the Commonwealth clearly articulated the importance of introducing these *crimen falsi* adjudications because the case would boil down to the credibility of witnesses, and the Commonwealth noted there was no alternative means of attacking Appellant's credibility. (N.T. at 9-16). The court also noted the similarities between the present case and *Rivera, supra. Id.* at 15-16. In both cases, the juvenile adjudications occurred thirteen years prior to the date of trial, they were relevant to the jury's determination of credibility, and they did not suggest a propensity to commit a crime of violence. *Id.*

Consistent with the holdings in *Randall*, *Rivera*, and *Hoover*, the trial court properly concluded that the Commonwealth did establish probative value to the admissibility of Appellant's *crimen falsi* juvenile adjudications. (N.T. at 16). Furthermore, the probative value substantially outweighed any prejudice. *Id.* Therefore, the court properly ruled that the prior adjudications would be admissible if Appellant elected to testify at trial

**II.    The trial court did not err in denying Appellant's assertion that there was a conflict of interest in his representation at trial by a public defender, where the assertion was not timely made and the PCRA he had previously filed involved representation by another member of the public defender's office in an unrelated case.**

Appellant essentially argues the trial court erred in denying his assertion that there was a conflict of interest in his continued representation at trial by a public defender, because he had previously filed a PCRA petition involving representation by another member of the public defender's office in an earlier, unrelated case. *See* Statement.

After the jury had been empaneled and the court adjourned for lunch, Appellant made a request for a trial continuance so he could hire private counsel. (N.T. at 100, 105-06). When it

9

was pointed out that he had over one year to obtain private counsel, Appellant responded that he was only now able to afford private counsel, and private counsel would need more time to prepare for trial. *Id.* at 105, 117. In making this request, Appellant expressed dissatisfaction with current trial counsel by claiming that counsel had withheld exculpatory discovery evidence until just recently, she did not meet with him prior to trial, she did not discuss strategy with him, and she was not prepared to proceed. *Id.* at 106-07.

In response, counsel noted that she entered her appearance approximately one year prior to trial, and she has represented Appellant continuously since then. (N.T. at 111). Counsel has been speaking with the prosecutor for several months about the case, she has spoken to Appellant about the case, she reviewed discovery with him, she filed motions on Appellant's behalf, and she was fully prepared to proceed to trial. *Id.* at 109-12. Moreover, Appellant was just transported to Lancaster County Prison ("LCP") from state prison on April 5, 2018, where he was incarcerated over the past seven months on an unrelated felony drug conviction, and counsel made special arrangements to meet with Appellant the same day he was returned to LCP. *Id.* at 109, 127-28. Furthermore, although it is against office policy in sex offense cases, counsel gave Appellant a copy of the discovery. *Id.* at 110.

The Commonwealth objected to a continuance. (N.T. at 116). According to the prosecutor, eighteen witnesses had already been subpoenaed and three of those witnesses were traveling considerable distances from out of town. *Id.* The Commonwealth was prepared to proceed to trial. *Id.*

In denying Appellant's request for a continuance, the court noted that the offenses occurred on November 29, 2016, the complaint was filed on February 17, 2017, the case was

10

previously continued by Appellant on at least three occasions over the past year, Appellant had more than one year to retain private counsel, both counsel were prepared to proceed to trial, and a jury had already been empaneled. (N.T. at 118-20).[3]

After the continuance request was denied, Appellant stated there was a conflict of interest because he and counsel disagreed on how to proceed. (N.T. at 120). Appellant also claimed that counsel told him not to provide the names of any witnesses because it was not necessary. *Id.* In response, counsel stated an individual contacted her office just yesterday claiming he was in Appellant's residence on the day in question, and he was the one who had sexual relations with the complainant. *Id.* at 122. However, the Commonwealth noted that testimony from this witness would be refuted by a recorded telephone call in which Appellant is heard stating he was home alone with the victim and her sister at the time of this incident. *Id.* at 123-25.

The trial court dismissed Appellant's complaint and asked whether there was anything else to address, at which time Appellant stated he had already filed a PCRA. (N.T. at 125). When it was pointed out that he had not yet been convicted on these charges, Appellant stated it was for his prior felony drug conviction. *Id.* at 125-26. According to Appellant, he filed a PCRA in that case alleging ineffective assistance of Courtney Monson, another attorney in the

---

[3] The grant or denial of a motion for a continuance is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Commonwealth v. Brooks*, 104 A.3d 466, 469 (Pa. 2014). In *Brooks*, the Pennsylvania Supreme Court held that the trial court did not abuse its discretion in denying a continuance request by a defendant on the day of jury selection so the defendant could proceed *pro se*. *Id.* at 467. Moreover, in *Commonwealth v. Harding*, 369 A.2d 429 (Pa. Super. 1976), the trial court properly denied a defendant's motion for a continuance so he could obtain private counsel to replace appointed counsel where the defendant was not tried until 11 months after his arrest and the motion was not made until a few days before his trial. *Id.* at 430. In *Commonwealth v. Randolph*, 873 A.2d 1277 (Pa. 2005), the trial court acted within its discretion in a capital-murder trial in denying a defendant's request for a continuance to enable private counsel to represent him since the case had already been continued twice on the defendant and the defendant waited until two business days before trial was scheduled to begin to apprise the trial court of his desire for private counsel. *Id.* at 1282.

public defender's office. *Id.* As such, Appellant stated, "[i]t creates conflict of interest." *Id.* at 126. The court disagreed, noting the two cases were unrelated. *Id.*

In his Statement, Appellant asserts the court erred in denying his "objection" to an actual conflict of interest. *See* Statement. However, Appellant never made a specific objection to the continued representation of trial counsel. (N.T. at 125-26). Rather, he suggested there was a conflict of interest only after the jury was empaneled. *Id.* at 100, 126. Moreover, trial counsel never objected to continued representation of Appellant at trial, nor suggest there was a conflict of interest. *See,* Transcript, generally. Because Appellant never lodged a specific objection, and he exercised unreasonable delay in raising this issue, the matter should be deemed waived. *See Commonwealth v. Tucker,* 143 A.3d 955, 961 (Pa. Super. 2016) (failure to make timely and specific objection at appropriate stage of the proceedings will result in waiver of the issue).

Assuming, *arguendo,* the issue is not waived, there was no conflict of interest because trial counsel represented Appellant in a case that was completely unrelated to a separate case in which Appellant alleged that another public defender provided ineffective assistance of counsel.

Rule 1.7 of the Pennsylvania Rules of Professional Conduct states that a lawyer shall not represent a client if the representation of one client will be directly adverse to another client, or if there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client, a former client or a third person, or by a personal interest of the lawyer. *Id.* As such, the public defender's office may not represent co-defendants. *Commonwealth v. Westbrook,* 400 A.2d 160, 162-63 (Pa. 1979).

Moreover, a post-conviction petitioner who has claimed ineffective assistance of the public defender who served as trial or appellate counsel may not be represented in such a post-

conviction proceeding by the public defender's office. *Commonwealth v. Patrick*, 383 A.2d 935, 936 (Pa. 1978). The law will not assume that counsel has advised his client of his inadequacies or those of his associates. *Commonwealth v. Via*, 316 A.2d 895, 898 (Pa. 1974).

However, a lawyer associated in a firm is not prohibited from representing a client whom an associate is prohibited from representing where the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm. *See* Pennsylvania Rule of Professional Conduct (1.10). In *Commonwealth v. Sawyer*, 454 A.2d 1088 (Pa. Super. 1982), the appellant likewise alleged it was a conflict of interest for the public defender's office to represent him at trial, where he was previously represented by the public defender's office on an unrelated charge in which the appellant subsequently alleged ineffective assistance of counsel on appeal, and that appeal was pending at the time of the instant trial. *Id.* at 1091. The Superior Court disagreed, finding there was no actual conflict of interest. *Id.*

Thus, although the public defender who represented Appellant in the prior criminal case would be prohibited from representing Appellant on the present charges because Appellant was alleging in a post-conviction proceeding that former counsel was ineffective, the personal interest of the prohibited lawyer in that case did not present a significant risk of materially limiting the representation of Appellant by the remaining lawyers of the public defender's office in this completely unrelated case. Therefore, Appellant's assertion in this regard is without merit.[4]

---

[4] It should be noted that trial counsel was extremely vigorous in representing Appellant. Counsel filed pretrial motions seeking to pierce the Rape Shield Law and preclude admission of Appellant's prior *crimen falsi* adjudications. Counsel also forcefully advocated on Appellant's behalf during the trial. To that end, counsel obtained acquittals on the two most serious charges of rape and sexual assault.

13

**III.**    **The trial court did not err in denying Appellant's motion to admit impeachment evidence on the grounds of the rape shield law.**

Appellant claims the trial court erred in denying his motion to admit impeachment evidence on the grounds of the Rape Shield law. *See* Statement. 18 Pa.C.S.A. § 3104, Evidence of victim's sexual conduct, provides:

> (a) General rule.—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

> (b) Evidentiary proceedings.—A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S.A. § 3104.

Prior to trial, Appellant timely filed a motion seeking to admit DNA evidence which would show that there were three DNA profiles of at least three individuals on the sperm fraction from the crotch area of the victim's underwear who did not match the DNA profile of Appellant. *See* Defendant's Motion to Admit Evidence Related to 18 Pa.C.S.A. § 3104. According to Appellant, this would be offered to "establish the consensual nature of this encounter and to negate the element of forced penetration regarding the rape charge." *Id.*; (N.T. at 18-19). The Commonwealth filed a motion seeking to preclude any reference by Appellant to the victim's sexual activity with other individuals, because introduction of such evidence would be presented merely to sully the reputation and chastity of the victim. *See* Motion *in Limine*.

14

During a pre-trial hearing, Appellant argued this evidence was also relevant because it would go to the credibility of the victim. (N.T. at 19). Appellant then sought to submit an ex parte motion which would call into question the veracity of the victim. *Id.* at 20.[5] According to the motion, the victim responded to a Forensic Services Sexual Assault Information Sheet on December 3, 2016, stating she had not had intercourse within two weeks of the alleged assault. *See* Defendant's Ex Parte Motion to Admit Impeachment Evidence. After the DNA results revealed unidentified male DNA profiles, the victim indicated that approximately two weeks prior to the alleged rape she was in New York City and had engaged in sexual intercourse. *Id.* Appellant claimed this response was "in total contradiction" to the previous answer the victim gave on the sexual assault information sheet, and it should be admissible to impeach the victim and her credibility. *Id.*

In response, the prosecutor stated that the DNA analyst would acknowledge Appellant's DNA profile was not found in the vaginal swabs, which itself could negate the victim's assertion that Appellant had sexual contact. (N.T. at 36).[6] Furthermore, sexual relations with another person had no bearing on the victim's credibility, or whether she was raped by Appellant. *Id.* at 37. Additionally, Appellant was recorded the weekend before trial admitting to his mother that he did have sex with the victim. *Id.* at 42-43. Moreover, Appellant's profile was found in a non-sperm fraction taken from the crotch of the victim's underwear, which would suggest there was

---

[5] Because the information contained in the ex parte motion was provided to Appellant by the Commonwealth in discovery, the court declined to rule on the motion in an ex parte fashion without giving the Commonwealth an opportunity to respond. (N.T. at 21-24, 44-45).

[6] Patrice Ferlan ("Ferlan"), a forensic DNA scientist with the Pennsylvania State Police ("PSP"), later testified that Appellant's DNA was not present in the sperm fraction of the external genitalia sample or the sperm fraction of the crotch area of the underwear. (N.T. at 387, 399).

15

some sort of contact between Appellant and the crotch of the victim's underwear. *Id.* at 38.[7] As such, this was not a case of misidentification. *Id.* at 42.

Regarding Appellant's original motion, the court questioned how the DNA profile of another person would establish the consensual nature of this encounter, negate the element of forced penetration regarding the rape charge, or disprove the allegations against Appellant. (N.T. at 20, 26, 30). Regarding Appellant's ex parte motion, the court questioned whether the evidence actually showed that the victim was untruthful. *Id.* at 47, 49-50. On the information sheet, the victim stated she did not have sexual intercourse **within** the past two weeks. *Id.* at 47 (emphasis added). When confronted with the DNA results, the victim did not recant or admit she had sexual intercourse within two weeks, but rather stated she engaged in sexual intercourse approximately two weeks prior. *Id.* Furthermore, the DNA expert would not be able to establish when the victim would have had intercourse with another individual, or when the DNA source would have been placed in the underwear. *Id.* at 28-30.

After reviewing legal authority, the court weighed the limited probative value of admitting DNA evidence to show the victim had sexual relations with someone other than Appellant against the clear prejudice of impugning the morality and integrity of the victim by doing so, and the court found that the prejudice outweighed any probative value. (N.T. at 31-36, 40-42, 52-53). Therefore, the evidence was precluded. *Id.* at 53.

"The purpose of the Rape Shield Law is to prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim. The Rape Shield Law is

---

[7] The DNA expert testified that Appellant's DNA profile was found on the Y chromosome DNA profile of a non-sperm fraction of the crotch area of the victim's underwear, in a mixture which showed two different people. (N.T. at 387, 401-02).

16

intended to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants." *Commonwealth v. Burns*, 988 A.2d 684, 689 (Pa. Super. 2009) (footnotes and citations omitted). "[T]he Rape Shield law will bow to a defendant's right to confront and cross-examine when a specific proffer demonstrates that the proposed inquiry is intended to elicit relevant evidence, which is more probative than prejudicial, and which is not cumulative of other evidence available without encroaching upon Rape Shield law protections." *Commonwealth v. Nieves*, 582 A.2d 341, 347 (Pa. Super. 1990). In *Nieves*, the Superior Court found that such evidence was inadmissible where it merely provided an alternate source for evidence of sexual abuse without precluding the appellant's guilt. *Id.* at 349.

In *Commonwealth v. Burns*, 988 A.2d 684 (Pa. Super. 2009), the Superior Court noted that the Rape Shield law is inapplicable if the evidence (1) negates directly the act of intercourse with which a defendant is charged; (2) demonstrates a witness' bias or attacks that credibility; or (3) tends to directly exculpate the accused by showing that the alleged victim is biased and thus has a motive to lie, fabricate, or seek retribution via prosecution. *Id.* at 690. In *Burns*, the Court found that DNA located on the victim's shorts which did not match the defendant's DNA was inadmissible, because any evidence that the victim engaged in sexual activity with another person did not negate the sexual assault by the defendant. *Id.* at 692-93.

In *Commonwealth v. Cramer*, ___ A.3d ___ , 2018 WL 4232479 (Pa. Super. 2018), the defendant admitted he and the victim engaged in sexual activity but claimed it was consensual. *Id.* at *4-5. Citing the Rape Shield law, the trial court precluded a DNA expert from testifying about forensic results which showed three contributors of sperm on the victim's underwear. *Id.* at *4. The Superior Court affirmed, stating, "Appellant's argument that the DNA evidence was

17

relevant to show that the Victim engaged in sexual relations with other individuals is irrelevant to the issue of whether the Victim consented to having sex with Appellant." *Id.* at *5.

The defendant in *Cramer* further argued the testimony was relevant to "show that the Complainant lied to the hospital staff in two questionnaires that the Victim completed, where she answered that she had not had sexual intercourse with anyone in either the past five days or two weeks." *Cramer*, 2018 WL 4232479, at *6. According to the defendant, the DNA forensic expert could testify that based on his analysis of the underpants, the victim had sexual intercourse seven to ten days ago with her ex-boyfriend and thus, the victim lied on the questionnaires. *Id.* The Superior Court disagreed, finding that impeaching the victim through the DNA expert in relation to the victim's answers on the questionnaires would also have been irrelevant. *Id.*

The instant case is very similar to *Cramer*. Both defendants admitted engaging in sexual activity with the victims. Both claimed the victims consented. The proffered testimony in both cases was from a DNA analyst about testing which showed three contributors of sperm on the victims' underwear. The defendants in both cases argued that DNA testimony was relevant to show that the victims lied when they originally stated they did not have sexual intercourse with anyone in the recent past. In both cases, evidence of the victim's sexual conduct with other persons was of little relevance to the issue of consent, and impeaching the victims through a DNA expert about answers they gave in earlier statements would have been irrelevant.

When reviewing whether the trial court properly found that the Rape Shield law precluded evidence of the victim's prior sexual activity, the Superior Court's standard of review is to determine whether the trial court committed an abuse of discretion. *Cramer*, 2018 WL 4232479, at *5. Because there was no abuse of discretion in this case, the claim must fail.

18

**IV.** **The trial court did not err in determining that testimony from two Commonwealth witnesses, whom the victim spoke to after the alleged assault, constituted prior consistent statements.**

Appellant next claims the trial court erred in determining that testimony from two Commonwealth witnesses, whom the victim spoke to after the assault, constituted prior consistent statements. *See* Statement. Relevant sections of Pennsylvania Rule of Evidence 613 (Witness's Prior Consistent Statement to Rehabilitate), read as follows:

> (c) Witness's Prior Consistent Statement to Rehabilitate. Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:
> > (1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or
> > (2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

Pa.R.E. 613(c).

When a witness's testimony is challenged as the product of inaccurate memory or faulty recollection, a consistent statement made by the witness prior to the time of the charged faulty memory is admissible in response to the attack. *Commonwealth v. Smith*, 586 A.2d 957, 963-64 (Pa. Super. 1991). Where counsel cross-examines a witness as to their ability to recall events due to high alcohol consumption, prior consistent statements are admissible. *Commonwealth v. Paolello*, 665 A.2d 439, 452-53 (Pa. 1995). If a witness explains an inconsistent statement introduced by the cross-examiner, a consistent statement supporting the witness's explanation is admissible. *Commonwealth v. Harris*, 852 A.2d 1168, 1176 (Pa. 2004). Further, prior consistent statements are admissible to refute a charge of fabrication if the prior consistent statement was made before the motive to lie existed. *Commonwealth v. Busanet*, 54 A.3d 35, 53 (Pa. 2012).

19

In her opening statement to the jury, Appellant's counsel immediately attacked the victim's credibility by stating:

> the only reason that we're here today is because [the victim] was caught having sex with my client, Manuel. That's the only reason why we're here today. She got caught. Plain and simple. This was someone that her sister was trying to establish a relationship with. [The prosecutor] told you that. And rather than just tell the truth and deal with those consequences, she decided to lie about it. She decided to lie about it rather than coming clean.

(N.T. at 162-63). Counsel claimed the sex was consensual. *Id.* at 168. During cross-examination, counsel questioned the victim about her alcohol consumption and lack of memory. *Id.* at 267-68, 273, 276. Counsel very aggressively questioned the victim about a prior statement she gave to police, which the victim explained was in some respects not true or inconsistent with her trial testimony. *Id.* at 269-73. Counsel challenged the victim's credibility by confronting her with the preliminary hearing transcript. *Id.* at 276-79, 281-85. Counsel also challenged the victim's version of events by pointing out the lack of injuries or torn clothing. *Id.* at 288-92.

On re-direct examination, when the prosecutor asked the victim to explain her prior statement to police and testimony from the preliminary hearing, the following occurred:

PROSECUTOR: You [sic] asked a lot of questions about things before and after the assault and who you said what to when. Your testimony here today was you woke up, he was on top of you, he pulled your pants down and penetrated you with his penis, correct?

VICTIM: Correct.

PROSECUTOR: And you didn't consent to that?

VICTIM: No, I didn't.

PROSECUTOR: You didn't say it was all right?

VICTIM: No.

PROSECUTOR: Have you ever told this version -- that what you just testified to of that incident any differently?

VICTIM: No.

PROSECUTOR:     Okay. So when you told the detective, initial detective, about how the driving situation was, did that in any way impact the fact that you were raped?

VICTIM:         No.

PROSECUTOR:     And whether you had one drink or three drinks at the club, did that have any impact on the fact that you were sexually assaulted and how it was done?

VICTIM:         No. I still remember everything.

PROSECUTOR:     When -- whether you ran out of the home immediately after being raped or you ran upstairs and got your belongings, again, does it change how you were raped that day?

VICTIM:         No.

(N.T. at 296-98).

After the victim testified, Appellant sought to preclude proffered testimony from the victim's mother and friend, by claiming their testimony would only serve to bolster the victim's credibility, a prompt complaint had already been established, and the testimony of the friend would be hearsay because the victim had already testified about their conversation. (N.T. at 324-25).[8] The prosecutor replied that the testimony would be admissible as evidence of a prompt complaint, or as a prior consistent statement because the victim had been "impeached to a great degree. . ." *Id.* at 325-26. Appellant's counsel initially agreed that she had attacked the victim's credibility, before recanting and stating "I did not - - as to the events that she had - - as to, I guess, her rape allegations, her aggravated indecent assault allegations, I have not attacked her credibility on, I believe, either one of them, as to her version of the events." *Id.* at 327-28.

The court noted that counsel had clearly attacked the victim's credibility by calling the victim a liar in her opening statement, claiming the sexual conduct was consensual, and

_____

[8] During the victim's re-direct examination, the prosecutor presented as a prior consistent statement text messages about the assault that were exchanged between the victim and her sister. (N.T. at 299-305). Appellant did not object to this testimony being offered as a prior consistent statement. *Id.*

21

challenging the victim's credibility on cross-examination of the victim. (N.T. at 326-29).

Therefore, the court ruled that the witnesses would be permitted to testify about prior consistent statements. *Id.* at 328-29. Appellant took exception to the ruling. *Id.* at 329. Counsel also made a blanket objection immediately prior to the testimony of the friend. *Id.* at 341.[9]

Appellant clearly accused the victim of fabrication and/or faulty memory, while questioning the victim's ability to recall events due to high alcohol consumption. Counsel also introduced prior inconsistent statements made by the victim. Therefore, the prior consistent statements were properly admitted to rehabilitate the victim by rebutting the charge of fabrication or faulty memory, and to support the victim's explanation of the prior inconsistent statements.

Assuming, *arguendo*, the evidence was not admissible as a prior consistent statement, the Superior Court can affirm the court's decision "if there is any basis to support it, even if we rely on different grounds to affirm." *Commonwealth v. Williams*, 35 A.3d 44, 47 (Pa. Super. 2011). Evidence of a complaint of sexual assault, independent of its potential admissibility as a prior consistent statement, is admissible to prove a complaint was made and to identify the specific incident with the offense charged. *Commonwealth v. Snoke*, 580 A.2d 295, 300 (Pa. 1990).

In the present case, testimony established that the victim and Kaitlyn left Appellant's residence immediately after the sexual assault and got into their car, at which time Appellant

---

[9] The sole basis for Appellant's objection to admissibility of the prior consistent statements was an assertion that counsel did not attack the credibility of the victim. Appellant should not be permitted to advance any other reason on appeal. *See Commonwealth v. Cline*, 177 A.3d 922, 927 (Pa. Super. 2017) (a new and different theory of relief may not be successfully advanced for the first time on appeal); *Commonwealth v. Cole*, 167 A.3d 49, 64 (Pa. Super. 2017) (defendant waived claims where objection at trial made no mention of the specific objection the defendant is raising on appeal); *Commonwealth v. McGriff*, 160 A.3d 863, 871 (Pa. Super. 2017) (if counsel states the grounds for an objection, then all other unspecified grounds are waived and cannot be raised for the first time on appeal).

came outside and tried to get them to stay. Still images from a safety coalition video taken at 7:23 a.m. and 7:32 a.m. showed Appellant standing at the front of the victim's car leaning into the driver's window. The victim's car then left the scene at around 7:56 a.m.

While Appellant was at the car, the victim was crying and talking on the phone with Hatchel. When they left Appellant's residence, the victim drove to Hatchel's house and arrived there between 9:00 a.m. and 9:30 a.m. that morning. The victim promptly told Hatchel that she was asleep on a couch and when she awoke a male was on top of her. The victim related that she kept telling him "no" and tried to push him off, but the male "stuck it in her." The victim was crying hysterically when she told Hatchel what happened. After that, the victim went home and told her mother.[10]

Testimony of a prompt complaint is competent evidence when limited to establish that a complaint was made and to identify the occurrence complained of with the offense charged. *Commonwealth v. Freeman*, 441 A.2d 1327, 1331 (Pa. Super. 1982). There is a presumption that a victim has not had time to fabricate if a prompt complaint is made, and the victim's story is given more credibility. *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006). In *Freeman*, testimony by the victim's sister-in-law confirming that the victim related the incident to her immediately following its occurrence was admissible to show prompt complaint. 441 A.2d at 1332. Thus, the testimony in this case would be admissible as a prompt complaint.

Furthermore, an erroneous ruling on an evidentiary issue does not automatically entitle a defendant to relief where the error was harmless. *Commonwealth v. Yockey*, 158 A.3d 1246,

---

[10] In addition to prompt complaint, the prosecutor argued that this testimony would also be admissible as an excited utterance or present sense impression. (N.T. at 326).

23

1254 (Pa. Super. 2017). Not all errors at trial entitle an appellant to a new trial, and the harmless error doctrine reflects the reality that an accused is entitled to a fair trial but not a perfect trial. *Commonwealth v. Green*, 162 A.3d 509, 519 (Pa. Super. 2017). An error may be harmless if the properly admitted evidence of guilt is so overwhelming and the prejudicial effect so insignificant by comparison that it is clear beyond a reasonable doubt the error could not have contributed to the verdict. *Commonwealth v. Stetler*, 95 A.3d 864, 890 (Pa. Super. 2014).

Presently, the properly admitted evidence of guilt was overwhelming. Video surveillance showed the victim arriving at Appellant's residence. The victim testified that Appellant put his fingers into her vagina without her consent in the bedroom and used force to sexually assault her downstairs. The victim's sister saw Appellant's hand move towards the victim while they were upstairs in bed, went downstairs to find Appellant on top of the victim, and heard her sister scream for help while trying to push Appellant off of her. Appellant's DNA profile was found on the non-sperm fraction of DNA taken from the victim's underwear. Appellant admitted he inserted his fingers into the victim's vagina while they were upstairs in bed and again on the couch downstairs. Furthermore, Appellant sent the victim's sister a text message after the incident asking Kaitlyn to tell the victim he was sorry and asking for forgiveness.

It is also clear beyond a reasonable doubt that the testimony of Hatchel and Aston was not prejudicial and did not contribute to the verdict. Hatchel testified that the victim told her a male inserted his penis into her vagina. Aston testified the victim said she was raped. Nevertheless, the jury returned not guilty verdicts on the counts of rape and sexual assault. Hatchel further testified that the victim never told her the male inserted his fingers into her vagina. Nevertheless, the jury found Appellant guilty of aggravated indecent assault for that specific act.

24

**V.** **The trial court did not impose an illegal sentence on counts three and four of the Information because they do not merge for sentencing purposes.**

Finally, Appellant asserts the court imposed an illegal sentence on counts three and four of the Information because they should have merged for sentencing purposes. *See* Statement.

At sentencing, the prosecutor argued that the two counts of aggravated indecent assault did not merge for sentencing purposes because these were two distinct acts. (N.T.S. at 2, 14). The aggravated indecent assault charge in count four was based on digital penetration that occurred without the victim's consent in the upstairs bedroom. *Id.* at 14-15. The aggravated indecent assault charge in count three was based on digital penetration by forcible compulsion that occurred downstairs. *Id.* at 15. Appellant's counsel, who did not represent Appellant at trial, was unable to respond. *Id.* at 8, 15-16. Thereafter, the sentencing court agreed with the Commonwealth that these were two distinct acts which occurred in two different locations of the house at two different times, approximately twenty to thirty minutes apart. *Id.* at 16.

Merger of sentences is governed generally by Section 9765 of the Sentencing Code, which provides:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765. Thus, the merger statute prohibits merger unless the crimes arise from a single criminal act and all statutory elements of one of the offenses are included in the statutory elements of the other. *Commonwealth v. Tanner*, 61 A.3d 1043, 1046 (Pa. Super. 2013).

When considering whether there is a single criminal act or multiple criminal acts for purposes of merger at sentencing, the question is not whether there is a break in the chain of

25

criminal activity, but rather whether the actor committed multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime. *Commonwealth v. Pettersen*, 49 A.3d 903, 912 (Pa. Super. 2012). In *Pettersen*, the defendant's three convictions for aggravated assault did not merge even though the time between the acts was relatively short, where the defendant struck the victim in the head with a hammer, stabbed the victim in the chest and back, and then attempted to suffocate the victim by placing a bag over her head. *Id.*

Moreover, in *Commonwealth v. Rhoades*, 8 A.3d 912 (Pa. Super. 2010), two counts of aggravated assault were not subject to merger for sentencing purposes where the charges were based on two different subsections of the statute. *Id.* at 918; *see also Commonwealth v. Orie*, 88 A.3d 983, 1020 (Pa. Super. 2014) (two separate convictions for theft by diversion of services did not merge where the charged acts involved different time periods and the utilization of different employees).

In the present case, the two counts of aggravated indecent assault did not arise from a single criminal act. Rather, Appellant committed multiple criminal acts beyond that which was necessary to establish the bare elements of the additional crime. The acts involved different time periods, separated by twenty to thirty minutes, in different locations of the house. Additionally, the charges were based on two different subsections of the statute.[11] Therefore, Appellant's claim in this regard must fail.

---

[11] The aggravated indecent assault count committed in the upstairs bedroom was based on lack of consent found at 18 Pa.C.S.A. § 3125(a)(1). The aggravated indecent assault count committed on the downstairs sofa was based on forcible compulsion found at 18 Pa.C.S.A. § 3125(a)(2).

## CONCLUSION

Based on the foregoing, the trial court properly: (1) admitted Appellant's *crimen falsi* convictions; (2) found that Appellant failed to make a timely objection to continued representation by the public defender, or in the alternative found that continued representation was not a conflict of interest; (3) denied Appellant's request to introduce evidence relating to other sexual relations involving the victim; (4) determined that the testimony of two Commonwealth witnesses was admissible as prior consistent statements in relation to the victim's prompt complaint; and (5) concluded that two counts of aggravated indecent assault did not merge for sentencing purposes where they were based on different criminal acts. Therefore, this appeal should be denied.

BY THE COURT:

DONALD R. TOTARO, JUDGE

Date:    October 3, 2018

Copies:    Fritz K. Haverstick, Esquire, Assistant District Attorney
            Heather L. Adams, Esquire, Counsel for Appellant

27

LANCASTER COUNTY, PA
2018 OCT -3 PM 3:29
CLERK OF COURTS

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA**
**CRIMINAL**

COMMONWEALTH OF PENNSYLVANIA      :

                                     :      1317 MDA 2018

vs.                               :

                                       :      CP-36-CR-0001286-2017

MANUEL PAGAN, JR.                  :

**PA R.A.P. 1925 OPINION**

BY TOTARO, J.

Presently before the Superior Court of Pennsylvania is an appeal filed by Manuel Pagan, Jr. ("Appellant") from the judgment of sentence imposed on July 11, 2018. For the reasons stated herein, the appeal should be denied.

**BACKGROUND**

On April 11, 2018, Appellant appeared before the court for a jury trial on one count of rape by forcible compulsion, one count of sexual assault, two counts of aggravated indecent assault, and two counts of indecent assault.[1] (Notes of Testimony, Trial at 68-70) (hereinafter "N.T."). At trial, Lauren Aston ("victim") testified that on November 29, 2016, when she was eighteen-years-old, she and her sister went to Appellant's studio to drink and hang out. *Id.* at 247-49. She had never met Appellant before that evening. *Id.* at 249-50. The victim, her sister, and Appellant then left the studio and went to Appellant's residence. *Id.* at 251.

When they got to the residence, all three went upstairs to eat and go to sleep. (N.T. at 254). After the victim laid down to go to sleep, Appellant put his hands down her pants and put his fingers into her vagina. *Id.* at 254-55. The victim, who did not give Appellant consent, left the bedroom and went downstairs to sleep on the sofa. *Id.* at 255-56. The next thing the victim

---

[1] 18 Pa.C.S.A. § 3121(a)(1), 18 Pa.C.S.A. § 3124.1, 18 Pa.C.S.A. § 3125(a)(2), 18 Pa.C.S.A. § 3125(a)(1), 18 Pa.C.S.A. § 3126(a)(2), and 18 Pa.C.S.A. § 3126(a)(1), respectively.

remembered was waking up with Appellant on top of her, his hands on her chest, and his penis in her vagina. *Id.* at 257-58. The victim told Appellant to stop and tried to push him off of her, but Appellant did not stop until the victim's sister came downstairs and pulled him off. *Id.* at 258.

The victim stated that she and her sister then left Appellant's house and got into their car, at which time Appellant came outside and tried to get them to stay. (N.T. at 258-59). While Appellant was at the car, the victim was crying and talking on the phone with her friend, Tiffany Hatchel ("Hatchel"). *Id.* at 259. When they left Appellant's residence, the victim dropped her sister off at their mother's home and drove to Hatchel's house, where she told Hatchel what had happened. *Id.* The victim then went home and told her mother, who called police. *Id.* at 259-60. This all happened on the same day as the sexual assault. *Id.*

The victim's sister, Kaitlyn Aston ("Kaitlyn"), testified that while they were in bed upstairs, she saw Appellant's hand moving towards the victim. (N.T. at 215). Later, after the victim went downstairs, Kaitlyn went downstairs to find Appellant on top of the victim. *Id.* at 218. The victim was screaming for help and trying to push Appellant off of her. *Id.*

Still images from a safety coalition video showed that on November 29, 2016, at 4:56 a.m., Appellant, the victim, and Kaitlyn arrived at Appellant's home by vehicle. (N.T. at 512-15). At 6:58 a.m., Appellant can be seen standing at the driver's side window of the victim's car. *Id.* at 515-16. Images taken at 7:23 a.m. and 7:32 a.m. show Appellant standing at the front of the victim's car leaning into the driver's window. *Id.* at 516-17. The victim's car then left the scene at around 7:56 a.m. *Id.* at 518-19.

Hatchel testified that on November 29, 2016, between 7:00 a.m. and 8:00 a.m., the victim called her on the telephone. (N.T. at 341-42). The victim was hysterical. *Id.* at 342. Later that

2

morning, between 9:00 a.m. and 9:30 a.m., the victim arrived at Hatchel's house and told Hatchel that she was asleep on a couch, she awoke, and a male was on top of her. *Id.* at 343-44. The victim related that she kept telling him "no" and tried to push him off, but the male then "stuck it in her and that was it." *Id.* at 344. The victim was crying hysterically and freaking out. *Id.* When Hatchel was asked whether the victim told her what the male put in her vagina, Hatchel responded that the victim said his penis. *Id.* at 347. When asked whether the victim told her if the male's fingers went inside her vagina, Hatchel replied, "No, ma'am." *Id.*

Renee Aston ("Aston"), the victim's mother, testified that during the late morning or early afternoon hours of November 29, 2016, the victim came home and began to cry. (N.T. at 348-49). The victim then told her mother that a male held her down and raped her. *Id.* at 349-50. Aston took her daughter to the hospital. *Id.* at 351.

Detective James Mummau of the Lancaster City Bureau of Police testified that he obtained an audio recording of a conversation Appellant had with his mother on April 6, 2018, which was marked as Commonwealth Exhibit #31. (N.T. at 526-28). The recording was played for the jury, and Appellant was heard admitting that he had sex with the victim. *Id.* at 533, 596. A second conversation was recorded on April 10, 2018, marked as Commonwealth Exhibit #32, in which Appellant referred to the victim as a "bitch," stated his DNA was not found in the victim, and police would not be able to prove they had sex. *Id.* at 534-35, 596-97. Appellant also sent Kaitlyn a text message after the incident stating, "[j]ust tell her I'm sorry again and I hope she can forgive me, and I hope she's okay." *Id.* at 223-26; Commonwealth Exhibit #8.

Appellant testified at trial and admitted that he inserted his hand into the victim's vagina while upstairs in bed. (N.T. at 626-27). The victim then left the bedroom because he was going

3

to have sex with her sister. *Id.* at 578-79. Approximately 20-30 minutes later, Appellant went downstairs to use the bathroom, he encountered the victim, she suggested they have sex, he inserted his fingers into the victim's vagina again, and they had sexual intercourse. *Id.* at 580-81, 627. Appellant stated the victim was flirting with him and she never said no. *Id.* at 570, 584.

After a three-day trial, Appellant was found not guilty of rape and sexual assault, but guilty on two counts of aggravated indecent assault and two counts of indecent assault. (N.T. at 722-23). A pre-sentence investigation was ordered. *Id.* at 725. On July 11, 2018, the court imposed a sentence of 5-10 years incarceration on count three for aggravated indecent assault involving forcible digital penetration which occurred downstairs. (Notes of Testimony, Sentencing at 30) ("N.T.S."). The court imposed a consecutive sentence of 2-10 years in prison on count four for aggravated indecent assault involving digital penetration which occurred upstairs without the victim's consent. *Id.* at 30-31. Concurrent sentences were imposed on the two counts of indecent assault, for an aggregate sentence of 7-20 years incarceration. *Id.*

On August 10, 2018, Appellant filed the instant Notice of Appeal to the Superior Court. On August 29, 2018, Appellant filed a Statement of Errors Complained of on Appeal ("Statement"), alleging that: (1) the trial court abused its discretion in determining the probative value of Appellant's 2005 *crimen falsi* convictions outweighed the prejudicial effect; (2) the trial court erred in denying Appellant's objection to an actual conflict of interest created by his filing of a PCRA Petition involving representation of Appellant in another case by another member of the Public Defender's Office; (3) the trial court erred in denying Appellant's motion to admit impeachment evidence on the grounds of the Rape Shield law; (4) the trial court erred in determining that testimony from two Commonwealth witnesses whom the victim spoke to after

4

the assault constituted prior consistent statements; and (5) Appellant's sentence was illegal because counts three and four of the Information should have merged for sentencing purposes. *See* Statement. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

**DISCUSSION**

**I.** **The trial court did not abuse its discretion in determining that the probative value of Appellant's 2005 *crimen falsi* convictions outweighed the prejudicial effect.**

Appellant first asserts the trial court abused its discretion in determining that the probative value of his 2005 *crimen falsi* convictions outweighed the prejudicial effect arising from the admission of the evidence. *See* Statement.

Prior to trial, the Commonwealth filed a notice seeking to introduce Appellant's prior juvenile delinquency adjudications from 2005, for counts of receiving stolen property, burglary, and theft by unlawful taking. *See* Commonwealth's Notice of Intent to Introduce Evidence of *Crimen Falsi* Conviction Where More Than Ten Years Has Elapsed. Appellant filed a motion in response seeking to preclude this testimony. *See* Defendant's Motion *in Limine*.

Relevant sections of Pennsylvania Rule of Evidence 609, Impeachment by Evidence of a Criminal Conviction, read as follows:

> (a) In General. For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.

> (b) Limit on Using the Evidence After 10 Years. This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:
> > (1) its probative value substantially outweighs its prejudicial effect; and
> > (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

5

(d) Juvenile Adjudications. In a criminal case only, evidence of the adjudication of delinquency for an offense under the Juvenile Act, 42 Pa.C.S. § § 6301 et seq., may be used to impeach the credibility of a witness if conviction of the offense would be admissible to attack the credibility of an adult.

Pa.R.E. 609.

During a pre-trial hearing, the Commonwealth stipulated that Appellant was released from confinement on these offenses more than ten years before the start of trial. (N.T. at 9).[2] However, the Commonwealth asserted that the *crimen falsi* adjudications would be extremely probative if Appellant elected to testify at trial, because the case would "boil down to his word versus the victim's word. . . ." *Id*. at 9-10. The Commonwealth further argued that because the prior adjudications were not sexually-related offenses, they would not in any way suggest to the jury that Appellant had a propensity to commit crimes of violence or sexual assaults. *Id*. at 10. As such, there would be very little prejudicial effect. *Id*.

Appellant argued in reply that there was no probative value to the adjudications because they occurred more than ten years ago, when he was under the age of 18. (N.T. at 11). Counsel further believed this would severely prejudice Appellant if he would testify, even though counsel agreed credibility would be at issue. *Id*. Moreover, counsel argued that the prejudicial effect of this testimony would outweigh any probative value. *Id*.

---

[2] In their Notice, the Commonwealth also sought to introduce juvenile adjudications from February 11, 2008, for the offenses of unsworn falsification to authorities and false identification to law enforcement authorities. *See* Commonwealth's Notice of Intent to Introduce Evidence of *Crimen Falsi* Conviction Where More Than Ten Years Has Elapsed. The sentences were imposed on March 3, 2008, at which time Appellant was placed in commitment for a period of six months. *Id*. Because Appellant was released from the secure facility within ten years of the date of trial, the court ruled that these adjudications were automatically admissible pursuant to Pa.R.E. 609. (N.T. at 7-8). Appellant has not challenged the admissibility of these juvenile adjudications on appeal.

6

In *Commonwealth v. Randall*, 528 A.2d 1326 (Pa. 1987), the Supreme Court identified five factors the court shall consider in determining whether the value of admitting *crimen falsi* convictions more than ten years old substantially outweighs its prejudicial effect. *Id*. at 1328-29. Those factors are: (1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; (2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; (3) the age and circumstances of the defendant; (4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and (5) the existence of alternative means of attacking the defendant's credibility. *Id*. at 1328 (quoting *Commonwealth v. Roots*, 393 A.2d 364, 367 (Pa. 1978).

In *Commonwealth v. Rivera*, 983 A.2d 1211 (Pa. 2009), the appellant, who was twenty-six years of age at the time of his murder trial, had prior juvenile adjudications for robbery and theft which occurred thirteen years prior to trial, when the appellant was only thirteen years old. *Id*. at 1217-18. The appellant contended the trial court abused its discretion by denying his motion *in limine* which requested the exclusion of evidence of his five juvenile adjudications that occurred more than ten years prior to his trial. *Id*. at 1226. After considering the factors identified in *Randall, supra*, the Supreme Court disagreed, concluding the trial court acted within its discretion in determining that appellant's prior juvenile adjudications were more probative than prejudicial. *Id*. at 1228.

7

As noted in *Rivera*, the previous adjudications of *crimen falsi* offenses were relevant to the jury's determination of the appellant's credibility, which was the crux of the case. 983 A.2d at 1228. The appellant's juvenile adjudications for theft offenses did not suggest a propensity to commit murder. *Id.* at 1229. Additionally, "[w]hile the age of Appellant at the time the offenses were committed may militate against admission of the evidence, the remaining factors, namely the prosecution's need to resort to this evidence and the lack of alternative means of attacking Appellant's credibility, clearly favor admission." *Id.*

In *Commonwealth v. Hoover*, 107 A.3d 723 (Pa. 2014), the defendant filed a motion *in limine* seeking to preclude the Commonwealth from impeaching him with evidence of his fourteen-year old *crimen falsi* conviction, which occurred when he was twenty-two years of age. *Id.* at 725. After balancing the *Randall* factors, the trial court denied the motion. *Id.* at 725-26. On appeal, the Superior Court vacated the judgment of sentence and remanded for a new trial after finding that the commission of a *crimen falsi* crime at the age of twenty-two could not be held against the defendant. *Id.* at 727. The Supreme Court disagreed, holding that the Superior Court "paid insufficient deference to the discretionary decision of the trial court, and is not otherwise supported by Pennsylvania law." *Id.* at 729. The Supreme Court then rejected any attempt to discount a prior conviction for impeachment purposes based on the youth of the defendant by stating, "there is no support in Pennsylvania law for the proposition that the probative value of a young adult offender's conviction 'is small.'" *Id.* at 732.

In the present case, the trial court conducted an analysis pursuant to the factors identified in *Randall* and determined that the prior adjudications would reflect upon the veracity of Appellant to a substantial degree, they were less likely to smear Appellant's character or suggest

8

a propensity to commit the crimes for which he stood charged because the prior adjudications were not related to the charges presently before the court, the Commonwealth clearly articulated the importance of introducing these *crimen falsi* adjudications because the case would boil down to the credibility of witnesses, and the Commonwealth noted there was no alternative means of attacking Appellant's credibility. (N.T. at 9-16). The court also noted the similarities between the present case and *Rivera, supra. Id.* at 15-16. In both cases, the juvenile adjudications occurred thirteen years prior to the date of trial, they were relevant to the jury's determination of credibility, and they did not suggest a propensity to commit a crime of violence. *Id.*

Consistent with the holdings in *Randall*, *Rivera*, and *Hoover*, the trial court properly concluded that the Commonwealth did establish probative value to the admissibility of Appellant's *crimen falsi* juvenile adjudications. (N.T. at 16). Furthermore, the probative value substantially outweighed any prejudice. *Id.* Therefore, the court properly ruled that the prior adjudications would be admissible if Appellant elected to testify at trial

**II.** **The trial court did not err in denying Appellant's assertion that there was a conflict of interest in his representation at trial by a public defender, where the assertion was not timely made and the PCRA he had previously filed involved representation by another member of the public defender's office in an unrelated case.**

Appellant essentially argues the trial court erred in denying his assertion that there was a conflict of interest in his continued representation at trial by a public defender, because he had previously filed a PCRA petition involving representation by another member of the public defender's office in an earlier, unrelated case. *See* Statement.

After the jury had been empaneled and the court adjourned for lunch, Appellant made a request for a trial continuance so he could hire private counsel. (N.T. at 100, 105-06). When it

9

was pointed out that he had over one year to obtain private counsel, Appellant responded that he was only now able to afford private counsel, and private counsel would need more time to prepare for trial. *Id.* at 105, 117. In making this request, Appellant expressed dissatisfaction with current trial counsel by claiming that counsel had withheld exculpatory discovery evidence until just recently, she did not meet with him prior to trial, she did not discuss strategy with him, and she was not prepared to proceed. *Id.* at 106-07.

In response, counsel noted that she entered her appearance approximately one year prior to trial, and she has represented Appellant continuously since then. (N.T. at 111). Counsel has been speaking with the prosecutor for several months about the case, she has spoken to Appellant about the case, she reviewed discovery with him, she filed motions on Appellant's behalf, and she was fully prepared to proceed to trial. *Id.* at 109-12. Moreover, Appellant was just transported to Lancaster County Prison ("LCP") from state prison on April 5, 2018, where he was incarcerated over the past seven months on an unrelated felony drug conviction, and counsel made special arrangements to meet with Appellant the same day he was returned to LCP. *Id.* at 109, 127-28. Furthermore, although it is against office policy in sex offense cases, counsel gave Appellant a copy of the discovery. *Id.* at 110.

The Commonwealth objected to a continuance. (N.T. at 116). According to the prosecutor, eighteen witnesses had already been subpoenaed and three of those witnesses were traveling considerable distances from out of town. *Id.* The Commonwealth was prepared to proceed to trial. *Id.*

In denying Appellant's request for a continuance, the court noted that the offenses occurred on November 29, 2016, the complaint was filed on February 17, 2017, the case was

10

previously continued by Appellant on at least three occasions over the past year, Appellant had more than one year to retain private counsel, both counsel were prepared to proceed to trial, and a jury had already been empaneled. (N.T. at 118-20).[3]

After the continuance request was denied, Appellant stated there was a conflict of interest because he and counsel disagreed on how to proceed. (N.T. at 120). Appellant also claimed that counsel told him not to provide the names of any witnesses because it was not necessary. *Id.* In response, counsel stated an individual contacted her office just yesterday claiming he was in Appellant's residence on the day in question, and he was the one who had sexual relations with the complainant. *Id.* at 122. However, the Commonwealth noted that testimony from this witness would be refuted by a recorded telephone call in which Appellant is heard stating he was home alone with the victim and her sister at the time of this incident. *Id.* at 123-25.

The trial court dismissed Appellant's complaint and asked whether there was anything else to address, at which time Appellant stated he had already filed a PCRA. (N.T. at 125). When it was pointed out that he had not yet been convicted on these charges, Appellant stated it was for his prior felony drug conviction. *Id.* at 125-26. According to Appellant, he filed a PCRA in that case alleging ineffective assistance of Courtney Monson, another attorney in the

---

[3] The grant or denial of a motion for a continuance is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Commonwealth v. Brooks*, 104 A.3d 466, 469 (Pa. 2014). In *Brooks*, the Pennsylvania Supreme Court held that the trial court did not abuse its discretion in denying a continuance request by a defendant on the day of jury selection so the defendant could proceed *pro se*. *Id.* at 467. Moreover, in *Commonwealth v. Harding*, 369 A.2d 429 (Pa. Super. 1976), the trial court properly denied a defendant's motion for a continuance so he could obtain private counsel to replace appointed counsel where the defendant was not tried until 11 months after his arrest and the motion was not made until a few days before his trial. *Id.* at 430. In *Commonwealth v. Randolph*, 873 A.2d 1277 (Pa. 2005), the trial court acted within its discretion in a capital-murder trial in denying a defendant's request for a continuance to enable private counsel to represent him since the case had already been continued twice on the defendant and the defendant waited until two business days before trial was scheduled to begin to apprise the trial court of his desire for private counsel. *Id.* at 1282.

11

public defender's office. *Id.* As such, Appellant stated, "[i]t creates conflict of interest." *Id.* at 126. The court disagreed, noting the two cases were unrelated. *Id.*

In his Statement, Appellant asserts the court erred in denying his "objection" to an actual conflict of interest. *See* Statement. However, Appellant never made a specific objection to the continued representation of trial counsel. (N.T. at 125-26). Rather, he suggested there was a conflict of interest only after the jury was empaneled. *Id.* at 100, 126. Moreover, trial counsel never objected to continued representation of Appellant at trial, nor suggest there was a conflict of interest. *See*, Transcript, generally. Because Appellant never lodged a specific objection, and he exercised unreasonable delay in raising this issue, the matter should be deemed waived. *See Commonwealth v. Tucker*, 143 A.3d 955, 961 (Pa. Super. 2016) (failure to make timely and specific objection at appropriate stage of the proceedings will result in waiver of the issue).

Assuming, *arguendo*, the issue is not waived, there was no conflict of interest because trial counsel represented Appellant in a case that was completely unrelated to a separate case in which Appellant alleged that another public defender provided ineffective assistance of counsel.

Rule 1.7 of the Pennsylvania Rules of Professional Conduct states that a lawyer shall not represent a client if the representation of one client will be directly adverse to another client, or if there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client, a former client or a third person, or by a personal interest of the lawyer. *Id.* As such, the public defender's office may not represent co-defendants. *Commonwealth v. Westbrook*, 400 A.2d 160, 162-63 (Pa. 1979).

Moreover, a post-conviction petitioner who has claimed ineffective assistance of the public defender who served as trial or appellate counsel may not be represented in such a post-

12

conviction proceeding by the public defender's office. *Commonwealth v. Patrick*, 383 A.2d 935, 936 (Pa. 1978). The law will not assume that counsel has advised his client of his inadequacies or those of his associates. *Commonwealth v. Via*, 316 A.2d 895, 898 (Pa. 1974).

However, a lawyer associated in a firm is not prohibited from representing a client whom an associate is prohibited from representing where the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm. *See* Pennsylvania Rule of Professional Conduct (1.10). In *Commonwealth v. Sawyer*, 454 A.2d 1088 (Pa. Super. 1982), the appellant likewise alleged it was a conflict of interest for the public defender's office to represent him at trial, where he was previously represented by the public defender's office on an unrelated charge in which the appellant subsequently alleged ineffective assistance of counsel on appeal, and that appeal was pending at the time of the instant trial. *Id.* at 1091. The Superior Court disagreed, finding there was no actual conflict of interest. *Id.*

Thus, although the public defender who represented Appellant in the prior criminal case would be prohibited from representing Appellant on the present charges because Appellant was alleging in a post-conviction proceeding that former counsel was ineffective, the personal interest of the prohibited lawyer in that case did not present a significant risk of materially limiting the representation of Appellant by the remaining lawyers of the public defender's office in this completely unrelated case. Therefore, Appellant's assertion in this regard is without merit.[4]

---

[4] It should be noted that trial counsel was extremely vigorous in representing Appellant. Counsel filed pretrial motions seeking to pierce the Rape Shield Law and preclude admission of Appellant's prior *crimen falsi* adjudications. Counsel also forcefully advocated on Appellant's behalf during the trial. To that end, counsel obtained acquittals on the two most serious charges of rape and sexual assault.

13

**III.    The trial court did not err in denying Appellant's motion to admit impeachment evidence on the grounds of the rape shield law.**

Appellant claims the trial court erred in denying his motion to admit impeachment evidence on the grounds of the Rape Shield law. *See* Statement. 18 Pa.C.S.A. § 3104, Evidence of victim's sexual conduct, provides:

> (a) General rule.—Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

> (b) Evidentiary proceedings.—A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an in camera hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S.A. § 3104.

Prior to trial, Appellant timely filed a motion seeking to admit DNA evidence which would show that there were three DNA profiles of at least three individuals on the sperm fraction from the crotch area of the victim's underwear who did not match the DNA profile of Appellant. *See* Defendant's Motion to Admit Evidence Related to 18 Pa.C.S.A. § 3104. According to Appellant, this would be offered to "establish the consensual nature of this encounter and to negate the element of forced penetration regarding the rape charge." *Id.*; (N.T. at 18-19). The Commonwealth filed a motion seeking to preclude any reference by Appellant to the victim's sexual activity with other individuals, because introduction of such evidence would be presented merely to sully the reputation and chastity of the victim. *See* Motion *in Limine*.

14

During a pre-trial hearing, Appellant argued this evidence was also relevant because it would go to the credibility of the victim. (N.T. at 19). Appellant then sought to submit an ex parte motion which would call into question the veracity of the victim. *Id.* at 20.[5] According to the motion, the victim responded to a Forensic Services Sexual Assault Information Sheet on December 3, 2016, stating she had not had intercourse within two weeks of the alleged assault. *See* Defendant's Ex Parte Motion to Admit Impeachment Evidence. After the DNA results revealed unidentified male DNA profiles, the victim indicated that approximately two weeks prior to the alleged rape she was in New York City and had engaged in sexual intercourse. *Id.* Appellant claimed this response was "in total contradiction" to the previous answer the victim gave on the sexual assault information sheet, and it should be admissible to impeach the victim and her credibility. *Id.*

In response, the prosecutor stated that the DNA analyst would acknowledge Appellant's DNA profile was not found in the vaginal swabs, which itself could negate the victim's assertion that Appellant had sexual contact. (N.T. at 36).[6] Furthermore, sexual relations with another person had no bearing on the victim's credibility, or whether she was raped by Appellant. *Id.* at 37. Additionally, Appellant was recorded the weekend before trial admitting to his mother that he did have sex with the victim. *Id.* at 42-43. Moreover, Appellant's profile was found in a non-sperm fraction taken from the crotch of the victim's underwear, which would suggest there was

---

[5] Because the information contained in the ex parte motion was provided to Appellant by the Commonwealth in discovery, the court declined to rule on the motion in an ex parte fashion without giving the Commonwealth an opportunity to respond. (N.T. at 21-24, 44-45).

[6] Patrice Ferlan ("Ferlan"), a forensic DNA scientist with the Pennsylvania State Police ("PSP"), later testified that Appellant's DNA was not present in the sperm fraction of the external genitalia sample or the sperm fraction of the crotch area of the underwear. (N.T. at 387, 399).

15

some sort of contact between Appellant and the crotch of the victim's underwear. *Id.* at 38.[7] As such, this was not a case of misidentification. *Id.* at 42.

Regarding Appellant's original motion, the court questioned how the DNA profile of another person would establish the consensual nature of this encounter, negate the element of forced penetration regarding the rape charge, or disprove the allegations against Appellant. (N.T. at 20, 26, 30). Regarding Appellant's ex parte motion, the court questioned whether the evidence actually showed that the victim was untruthful. *Id.* at 47, 49-50. On the information sheet, the victim stated she did not have sexual intercourse **within** the past two weeks. *Id.* at 47 (emphasis added). When confronted with the DNA results, the victim did not recant or admit she had sexual intercourse within two weeks, but rather stated she engaged in sexual intercourse approximately two weeks prior. *Id.* Furthermore, the DNA expert would not be able to establish when the victim would have had intercourse with another individual, or when the DNA source would have been placed in the underwear. *Id.* at 28-30.

After reviewing legal authority, the court weighed the limited probative value of admitting DNA evidence to show the victim had sexual relations with someone other than Appellant against the clear prejudice of impugning the morality and integrity of the victim by doing so, and the court found that the prejudice outweighed any probative value. (N.T. at 31-36, 40-42, 52-53). Therefore, the evidence was precluded. *Id.* at 53.

"The purpose of the Rape Shield Law is to prevent a trial from shifting its focus from the culpability of the accused toward the virtue and chastity of the victim. The Rape Shield Law is

---

[7] The DNA expert testified that Appellant's DNA profile was found on the Y chromosome DNA profile of a non-sperm fraction of the crotch area of the victim's underwear, in a mixture which showed two different people. (N.T. at 387, 401-02).

16

intended to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault complainants." *Commonwealth v. Burns*, 988 A.2d 684, 689 (Pa. Super. 2009) (footnotes and citations omitted). "[T]he Rape Shield law will bow to a defendant's right to confront and cross-examine when a specific proffer demonstrates that the proposed inquiry is intended to elicit relevant evidence, which is more probative than prejudicial, and which is not cumulative of other evidence available without encroaching upon Rape Shield law protections." *Commonwealth v. Nieves*, 582 A.2d 341, 347 (Pa. Super. 1990). In *Nieves*, the Superior Court found that such evidence was inadmissible where it merely provided an alternate source for evidence of sexual abuse without precluding the appellant's guilt. *Id.* at 349.

In *Commonwealth v. Burns*, 988 A.2d 684 (Pa. Super. 2009), the Superior Court noted that the Rape Shield law is inapplicable if the evidence (1) negates directly the act of intercourse with which a defendant is charged; (2) demonstrates a witness' bias or attacks that credibility; or (3) tends to directly exculpate the accused by showing that the alleged victim is biased and thus has a motive to lie, fabricate, or seek retribution via prosecution. *Id.* at 690. In *Burns*, the Court found that DNA located on the victim's shorts which did not match the defendant's DNA was inadmissible, because any evidence that the victim engaged in sexual activity with another person did not negate the sexual assault by the defendant. *Id.* at 692-93.

In *Commonwealth v. Cramer*, ___ A.3d ___, 2018 WL 4232479 (Pa. Super. 2018), the defendant admitted he and the victim engaged in sexual activity but claimed it was consensual. *Id.* at *4-5. Citing the Rape Shield law, the trial court precluded a DNA expert from testifying about forensic results which showed three contributors of sperm on the victim's underwear. *Id.* at *4. The Superior Court affirmed, stating, "Appellant's argument that the DNA evidence was

17

relevant to show that the Victim engaged in sexual relations with other individuals is irrelevant to the issue of whether the Victim consented to having sex with Appellant." *Id.* at *5.

The defendant in *Cramer* further argued the testimony was relevant to "show that the Complainant lied to the hospital staff in two questionnaires that the Victim completed, where she answered that she had not had sexual intercourse with anyone in either the past five days or two weeks." *Cramer*, 2018 WL 4232479, at *6. According to the defendant, the DNA forensic expert could testify that based on his analysis of the underpants, the victim had sexual intercourse seven to ten days ago with her ex-boyfriend and thus, the victim lied on the questionnaires. *Id.* The Superior Court disagreed, finding that impeaching the victim through the DNA expert in relation to the victim's answers on the questionnaires would also have been irrelevant. *Id.*

The instant case is very similar to *Cramer*. Both defendants admitted engaging in sexual activity with the victims. Both claimed the victims consented. The proffered testimony in both cases was from a DNA analyst about testing which showed three contributors of sperm on the victims' underwear. The defendants in both cases argued that DNA testimony was relevant to show that the victims lied when they originally stated they did not have sexual intercourse with anyone in the recent past. In both cases, evidence of the victim's sexual conduct with other persons was of little relevance to the issue of consent, and impeaching the victims through a DNA expert about answers they gave in earlier statements would have been irrelevant.

When reviewing whether the trial court properly found that the Rape Shield law precluded evidence of the victim's prior sexual activity, the Superior Court's standard of review is to determine whether the trial court committed an abuse of discretion. *Cramer*, 2018 WL 4232479, at *5. Because there was no abuse of discretion in this case, the claim must fail.

18

**IV.** **The trial court did not err in determining that testimony from two Commonwealth witnesses, whom the victim spoke to after the alleged assault, constituted prior consistent statements.**

Appellant next claims the trial court erred in determining that testimony from two Commonwealth witnesses, whom the victim spoke to after the assault, constituted prior consistent statements. *See* Statement. Relevant sections of Pennsylvania Rule of Evidence 613 (Witness's Prior Consistent Statement to Rehabilitate), read as follows:

> (c) Witness's Prior Consistent Statement to Rehabilitate. Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:
> (1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or
> (2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

Pa.R.E. 613(c).

When a witness's testimony is challenged as the product of inaccurate memory or faulty recollection, a consistent statement made by the witness prior to the time of the charged faulty memory is admissible in response to the attack. *Commonwealth v. Smith*, 586 A.2d 957, 963-64 (Pa. Super. 1991). Where counsel cross-examines a witness as to their ability to recall events due to high alcohol consumption, prior consistent statements are admissible. *Commonwealth v. Paolello*, 665 A.2d 439, 452-53 (Pa. 1995). If a witness explains an inconsistent statement introduced by the cross-examiner, a consistent statement supporting the witness's explanation is admissible. *Commonwealth v. Harris*, 852 A.2d 1168, 1176 (Pa. 2004). Further, prior consistent statements are admissible to refute a charge of fabrication if the prior consistent statement was made before the motive to lie existed. *Commonwealth v. Busanet*, 54 A.3d 35, 53 (Pa. 2012).

In her opening statement to the jury, Appellant's counsel immediately attacked the victim's credibility by stating:

> the only reason that we're here today is because [the victim] was caught having sex with my client, Manuel. That's the only reason why we're here today. She got caught. Plain and simple. This was someone that her sister was trying to establish a relationship with. [The prosecutor] told you that. And rather than just tell the truth and deal with those consequences, she decided to lie about it. She decided to lie about it rather than coming clean.

(N.T. at 162-63). Counsel claimed the sex was consensual. *Id.* at 168. During cross-examination, counsel questioned the victim about her alcohol consumption and lack of memory. *Id.* at 267-68, 273, 276. Counsel very aggressively questioned the victim about a prior statement she gave to police, which the victim explained was in some respects not true or inconsistent with her trial testimony. *Id.* at 269-73. Counsel challenged the victim's credibility by confronting her with the preliminary hearing transcript. *Id.* at 276-79, 281-85. Counsel also challenged the victim's version of events by pointing out the lack of injuries or torn clothing. *Id.* at 288-92.

On re-direct examination, when the prosecutor asked the victim to explain her prior statement to police and testimony from the preliminary hearing, the following occurred:

PROSECUTOR: You [sic] asked a lot of questions about things before and after the assault and who you said what to when. Your testimony here today was you woke up, he was on top of you, he pulled your pants down and penetrated you with his penis, correct?

VICTIM: Correct.

PROSECUTOR: And you didn't consent to that?

VICTIM: No, I didn't.

PROSECUTOR: You didn't say it was all right?

VICTIM: No.

PROSECUTOR: Have you ever told this version -- that what you just testified to of that incident any differently?

VICTIM: No.

PROSECUTOR: Okay. So when you told the detective, initial detective, about how the driving situation was, did that in any way impact the fact that you were raped?

VICTIM: No.

PROSECUTOR: And whether you had one drink or three drinks at the club, did that have any impact on the fact that you were sexually assaulted and how it was done?

VICTIM: No. I still remember everything.

PROSECUTOR: When -- whether you ran out of the home immediately after being raped or you ran upstairs and got your belongings, again, does it change how you were raped that day?

VICTIM: No.

(N.T. at 296-98).

After the victim testified, Appellant sought to preclude proffered testimony from the victim's mother and friend, by claiming their testimony would only serve to bolster the victim's credibility, a prompt complaint had already been established, and the testimony of the friend would be hearsay because the victim had already testified about their conversation. (N.T. at 324-25).[8] The prosecutor replied that the testimony would be admissible as evidence of a prompt complaint, or as a prior consistent statement because the victim had been "impeached to a great degree. . ." *Id.* at 325-26. Appellant's counsel initially agreed that she had attacked the victim's credibility, before recanting and stating "I did not - - as to the events that she had - - as to, I guess, her rape allegations, her aggravated indecent assault allegations, I have not attacked her credibility on, I believe, either one of them, as to her version of the events." *Id.* at 327-28.

The court noted that counsel had clearly attacked the victim's credibility by calling the victim a liar in her opening statement, claiming the sexual conduct was consensual, and

---

[8] During the victim's re-direct examination, the prosecutor presented as a prior consistent statement text messages about the assault that were exchanged between the victim and her sister. (N.T. at 299-305). Appellant did not object to this testimony being offered as a prior consistent statement. *Id.*

21

challenging the victim's credibility on cross-examination of the victim. (N.T. at 326-29). Therefore, the court ruled that the witnesses would be permitted to testify about prior consistent statements. *Id.* at 328-29. Appellant took exception to the ruling. *Id.* at 329. Counsel also made a blanket objection immediately prior to the testimony of the friend. *Id.* at 341.[9]

Appellant clearly accused the victim of fabrication and/or faulty memory, while questioning the victim's ability to recall events due to high alcohol consumption. Counsel also introduced prior inconsistent statements made by the victim. Therefore, the prior consistent statements were properly admitted to rehabilitate the victim by rebutting the charge of fabrication or faulty memory, and to support the victim's explanation of the prior inconsistent statements.

Assuming, *arguendo*, the evidence was not admissible as a prior consistent statement, the Superior Court can affirm the court's decision "if there is any basis to support it, even if we rely on different grounds to affirm." *Commonwealth v. Williams*, 35 A.3d 44, 47 (Pa. Super. 2011). Evidence of a complaint of sexual assault, independent of its potential admissibility as a prior consistent statement, is admissible to prove a complaint was made and to identify the specific incident with the offense charged. *Commonwealth v. Snoke*, 580 A.2d 295, 300 (Pa. 1990).

In the present case, testimony established that the victim and Kaitlyn left Appellant's residence immediately after the sexual assault and got into their car, at which time Appellant

---

[9] The sole basis for Appellant's objection to admissibility of the prior consistent statements was an assertion that counsel did not attack the credibility of the victim. Appellant should not be permitted to advance any other reason on appeal. *See Commonwealth v. Cline*, 177 A.3d 922, 927 (Pa. Super. 2017) (a new and different theory of relief may not be successfully advanced for the first time on appeal); *Commonwealth v. Cole*, 167 A.3d 49, 64 (Pa. Super. 2017) (defendant waived claims where objection at trial made no mention of the specific objection the defendant is raising on appeal); *Commonwealth v. McGriff*, 160 A.3d 863, 871 (Pa. Super. 2017) (if counsel states the grounds for an objection, then all other unspecified grounds are waived and cannot be raised for the first time on appeal).

came outside and tried to get them to stay. Still images from a safety coalition video taken at 7:23 a.m. and 7:32 a.m. showed Appellant standing at the front of the victim's car leaning into the driver's window. The victim's car then left the scene at around 7:56 a.m.

While Appellant was at the car, the victim was crying and talking on the phone with Hatchel. When they left Appellant's residence, the victim drove to Hatchel's house and arrived there between 9:00 a.m. and 9:30 a.m. that morning. The victim promptly told Hatchel that she was asleep on a couch and when she awoke a male was on top of her. The victim related that she kept telling him "no" and tried to push him off, but the male "stuck it in her." The victim was crying hysterically when she told Hatchel what happened. After that, the victim went home and told her mother.[10]

Testimony of a prompt complaint is competent evidence when limited to establish that a complaint was made and to identify the occurrence complained of with the offense charged. *Commonwealth v. Freeman*, 441 A.2d 1327, 1331 (Pa. Super. 1982). There is a presumption that a victim has not had time to fabricate if a prompt complaint is made, and the victim's story is given more credibility. *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006). In *Freeman*, testimony by the victim's sister-in-law confirming that the victim related the incident to her immediately following its occurrence was admissible to show prompt complaint. 441 A.2d at 1332. Thus, the testimony in this case would be admissible as a prompt complaint.

Furthermore, an erroneous ruling on an evidentiary issue does not automatically entitle a defendant to relief where the error was harmless. *Commonwealth v. Yockey*, 158 A.3d 1246,

---

[10] In addition to prompt complaint, the prosecutor argued that this testimony would also be admissible as an excited utterance or present sense impression. (N.T. at 326).

23

1254 (Pa. Super. 2017). Not all errors at trial entitle an appellant to a new trial, and the harmless error doctrine reflects the reality that an accused is entitled to a fair trial but not a perfect trial. *Commonwealth v. Green*, 162 A.3d 509, 519 (Pa. Super. 2017). An error may be harmless if the properly admitted evidence of guilt is so overwhelming and the prejudicial effect so insignificant by comparison that it is clear beyond a reasonable doubt the error could not have contributed to the verdict. *Commonwealth v. Stetler*, 95 A.3d 864, 890 (Pa. Super. 2014).

Presently, the properly admitted evidence of guilt was overwhelming. Video surveillance showed the victim arriving at Appellant's residence. The victim testified that Appellant put his fingers into her vagina without her consent in the bedroom and used force to sexually assault her downstairs. The victim's sister saw Appellant's hand move towards the victim while they were upstairs in bed, went downstairs to find Appellant on top of the victim, and heard her sister scream for help while trying to push Appellant off of her. Appellant's DNA profile was found on the non-sperm fraction of DNA taken from the victim's underwear. Appellant admitted he inserted his fingers into the victim's vagina while they were upstairs in bed and again on the couch downstairs. Furthermore, Appellant sent the victim's sister a text message after the incident asking Kaitlyn to tell the victim he was sorry and asking for forgiveness.

It is also clear beyond a reasonable doubt that the testimony of Hatchel and Aston was not prejudicial and did not contribute to the verdict. Hatchel testified that the victim told her a male inserted his penis into her vagina. Aston testified the victim said she was raped. Nevertheless, the jury returned not guilty verdicts on the counts of rape and sexual assault. Hatchel further testified that the victim never told her the male inserted his fingers into her vagina. Nevertheless, the jury found Appellant guilty of aggravated indecent assault for that specific act.

24

**V.** **The trial court did not impose an illegal sentence on counts three and four of the Information because they do not merge for sentencing purposes.**

Finally, Appellant asserts the court imposed an illegal sentence on counts three and four of the Information because they should have merged for sentencing purposes. *See* Statement.

At sentencing, the prosecutor argued that the two counts of aggravated indecent assault did not merge for sentencing purposes because these were two distinct acts. (N.T.S. at 2, 14). The aggravated indecent assault charge in count four was based on digital penetration that occurred without the victim's consent in the upstairs bedroom. *Id.* at 14-15. The aggravated indecent assault charge in count three was based on digital penetration by forcible compulsion that occurred downstairs. *Id.* at 15. Appellant's counsel, who did not represent Appellant at trial, was unable to respond. *Id.* at 8, 15-16. Thereafter, the sentencing court agreed with the Commonwealth that these were two distinct acts which occurred in two different locations of the house at two different times, approximately twenty to thirty minutes apart. *Id.* at 16.

Merger of sentences is governed generally by Section 9765 of the Sentencing Code, which provides:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765. Thus, the merger statute prohibits merger unless the crimes arise from a single criminal act and all statutory elements of one of the offenses are included in the statutory elements of the other. *Commonwealth v. Tanner*, 61 A.3d 1043, 1046 (Pa. Super. 2013).

When considering whether there is a single criminal act or multiple criminal acts for purposes of merger at sentencing, the question is not whether there is a break in the chain of

25

criminal activity, but rather whether the actor committed multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime. *Commonwealth v. Pettersen,* 49 A.3d 903, 912 (Pa. Super. 2012). In *Pettersen,* the defendant's three convictions for aggravated assault did not merge even though the time between the acts was relatively short, where the defendant struck the victim in the head with a hammer, stabbed the victim in the chest and back, and then attempted to suffocate the victim by placing a bag over her head. *Id.*

Moreover, in *Commonwealth v. Rhoades,* 8 A.3d 912 (Pa. Super. 2010), two counts of aggravated assault were not subject to merger for sentencing purposes where the charges were based on two different subsections of the statute. *Id.* at 918; *see also Commonwealth v. Orie,* 88 A.3d 983, 1020 (Pa. Super. 2014) (two separate convictions for theft by diversion of services did not merge where the charged acts involved different time periods and the utilization of different employees).

In the present case, the two counts of aggravated indecent assault did not arise from a single criminal act. Rather, Appellant committed multiple criminal acts beyond that which was necessary to establish the bare elements of the additional crime. The acts involved different time periods, separated by twenty to thirty minutes, in different locations of the house. Additionally, the charges were based on two different subsections of the statute.[11] Therefore, Appellant's claim in this regard must fail.

---

[11] The aggravated indecent assault count committed in the upstairs bedroom was based on lack of consent found at 18 Pa.C.S.A. § 3125(a)(1). The aggravated indecent assault count committed on the downstairs sofa was based on forcible compulsion found at 18 Pa.C.S.A. § 3125(a)(2).

## CONCLUSION

Based on the foregoing, the trial court properly: (1) admitted Appellant's *crimen falsi* convictions; (2) found that Appellant failed to make a timely objection to continued representation by the public defender, or in the alternative found that continued representation was not a conflict of interest; (3) denied Appellant's request to introduce evidence relating to other sexual relations involving the victim; (4) determined that the testimony of two Commonwealth witnesses was admissible as prior consistent statements in relation to the victim's prompt complaint; and (5) concluded that two counts of aggravated indecent assault did not merge for sentencing purposes where they were based on different criminal acts. Therefore, this appeal should be denied.

BY THE COURT:

Date: ___October 3, 2018___

DONALD R. TOTARO, JUDGE

Copies:     Fritz K. Haverstick, Esquire, Assistant District Attorney
            Heather L. Adams, Esquire, Counsel for Appellant

CLERK OF COURTS
2018 OCT -3 PM 3:29
LANCASTER COUNTY, PA

27